**WOODALL et ux. v. DICKSON ICE CREAM CO., Inc.**

No. 5600.

Court of Appeal of Louisiana. Second Circuit.

Jan. 28, 1938.

Rehearing Denied March 8, 1938.

Mabry & Carstarphen and E. W. & P. N. Browne, all of Shreveport, for appellant.

Isaac Abramson and Sylvan W. Gamm, both of Shreveport, for appellees.

TALIAFERRO, Judge.

Plaintiff, Mrs. Joe Woodall, a waitress in the Coffee Shop of the Caddo Hotel in the City of Shreveport, stumbled over or stepped into a metal milk carrier left by an employee of defendant, Dickson Ice Cream Co., Inc., on the tile floor of the Coffee Shop, lost her balance and fell heavily to the floor. She was seriously and painfully injured. She sues for damages for a large amount, and enumerates the elements thereof as being: Permanent injuries; pain, suffering, injuries to nervous system, and loss of earning power.

She alleges that at time of the accident she was in an early stage of pregnancy, and that, because of this condition, the internal injuries she suffered were more serious than would otherwise have been. She specifically avers that her ovaries were injured, producing swelling to her left side, and that she sustained a sacroiliac strain; that she was confined to her bed practically all the period from the date of the accident until she gave birth to a child on August 11, 1936, during which time, and since, she has suffered intense pain, directly due to the effects of said accident; that her disability is of a permanent character, requiring her to use crutches in order to go about; that in

addition to all of the foregoing, she has become nervous and hypersensitive, and the condition resulting from these abnormalities is also of a permanent character.

Her husband joins in the suit and sues for expenses alleged to have been incurred for physicians and nurses' services, medicine, X-rays, ambulance, crutches, etc.

The accident occurred about 8 o'clock a. m., December 9, 1935.

The petition sets forth that a servant of defendant, after delivering milk to the shop, carelessly and negligently left said milk carrier on the floor at or near the end of a long counter on which food is served to its customers, behind which plaintiff worked, and around the end of which she had to go to serve patrons who desired to eat at the small tables in the open floor of the shop; that she was unaware of the presence of said carrier until she stepped into it, and had no reason whatever to think that it had been left there, or that the path of travel from the end of the counter to the open part of the shop was obstructed or unsafe to any extent; that said carrier was, from the nature of its construction, a trap for persons walking about or around the end of said counter, and particularly for those who carried food, etc., to patrons at the tables.

Defendant denied generally the allegations of fact alleged upon. It averred that if the carrier was left on the Coffee Shop floor, as by plaintiff alleged, it was in open and plain view, and if plaintiff did not see it, she could have done so by the exercise of ordinary care and prudence; that her failure to exercise such care and prudence constituted the proximate cause of any injury she sustained by her fall. Defendant further alleged that to the knowledge of Mrs. Woodall, placing the carrier on the floor, in the manner described in her petition, was not an unusual occurrence and was one of which she should have taken notice, and otherwise exercised sufficient care to avoid stumbling or falling over it. Her negligence in these respects, in the alternative, is pleaded against recovery by her.

There was judgment for Mrs. Woodall in the sum of $3,000 and for her husband for $500. Defendant appealed.

The facts immediately preceding, at the time of and following the accident, are, in the main, undisputed.

The Coffee Shop of the Caddo Hotel is approximately 48 by 24 feet. A lunch counter, 39 inches high and 20 feet long, parallels and is a few feet from one of the side walls. One end of this counter is connected with an end wall. The passageway from behind the counter into the open area is reduced to 2 feet 4 inches, on account of space covered by an ice box which is parallel to the counter. In front of the counter there is a line of stools for use of patrons who eat thereat. The open space of the shop is occupied by tables and chairs for guests. At the time of the accident, some 7 feet intervened between the end of the counter and the tables nearest it, in a direct line. Waitresses coming from behind the counter with food, etc., for tables opposite its front side, followed the narrow passageway between it and the icebox, and turned at almost right angles at the counter's end.

Defendant supplied the Coffee Shop with milk. Its employees would bring the bottles of milk in carriers and crates and place them in the icebox. The morning of the accident, defendant's milk truck, in charge of one J. W. Lewis, assisted by Roy Price, stopped in front of the hotel to make a milk delivery. A crate and a carrier laden with milk were brought in by Lewis and Price. The former put the bottles in the icebox as was the custom. Price took the empty crate with him into the kitchen to put empty bottles in. Lewis deposited the empty milk carrier on the floor at the end of and against the counter and sat on the stool nearest the counter's end, while writing up a charge slip or ticket for the delivered milk. Having finished this, he left the carrier on the floor and sought a waitress in the kitchen to O. K. the ticket. He there assisted Price in gathering empty bottles. After the ticket was O. K.'d, Lewis returned to the Coffee Shop, passed by the carrier, made his exit through the front door, and joined Price, who had preceded him through the rear of the kitchen to the truck. They drove away and only missed the carrier some thirty minutes later. Price returned for it, but the accident had already occurred. Lewis said he expected Price to pick up the carrier and bring it to the truck. However, he must have known that Price had returned to the truck, as was his custom, via the rear exit, with a load of empty bottles in the crate.

A patron entered the Coffee Shop, the exact time of which, with regard to the above related facts, does not clearly appear, and took a chair at a table in front of the lunch counter. Mrs. Woodall took his order. He wished coffee in advance of breakfast. She returned to the back side of the counter picked up a tray, glass, spoon, etc., drew the coffee from the urn, and began the trip back to serve the customer.

She held the tray with contents in both hands in front of her, and as she began the right turn at the counter's end, she stepped into the carrier with one foot. It suddenly slid forward. She lost balance, and fell heavily to the tile floor, on right side and back. She was lifted to a chair. She soon resumed work, but after the lapse of an hour, her condition was such that the hotel manager advised her to go to bed in the hotel. A physician was summoned. She remained there for the night. She went to her home the following day and did not resume work until December 21st. She quit the job permanently on January 4th, following.

■ The carrier involved in the case is in basket form with handle eight inches high. It is constructed of heavy galvanized wire. It is 18 inches long, 9 inches wide, and 4½ inches deep. Its capacity is eight quart bottles. Potentially, from the very nature of its construction, it is a most dangerous agency to life or limb, when left on the floor of any place open to use by the public or others. It was gross negligence to have left it in the Coffee Shop at the end of the counter. It would have been less reprehensible to have left the carrier out in the open area of the floor. At the end of the counter, it was somewhat hidden from the view of persons who desired to pass the end either way.

■ In support of its plea of contributory negligence, defendant argues that Mrs. Woodall passed by and should have seen the metal carrier when she took the customer's order and returned to fill it. This argument is predicated upon the assumption that the carrier had then been deposited on the floor by Lewis. Mrs. Woodall is certain it was not there at the time. The record does not disprove this. It was entirely possible that while she was preparing to fill the customer's order that Lewis, having finished putting the milk in the box, deposited the carrier, made out the ticket, got it O. K.'d and left the shop. Transactions of this character are hurriedly done as many more deliveries were on the morning's schedule. And we here add that if the carrier had been on the floor when Mrs. Woodall returned with the patron's order and she failed to see it, this omission on her part would not constitute negligence of such character as to bar her right to recover damages resulting from the accident.

It is not improbable that as she returned with the order, her eyes were focused thereon or on some part of the shop ahead of her; and, in a measure, she was unmindful of conditions immediately about her. She had only worked there for one week, and during this time nothing had happened to impress her with the possibility that dangerous things might be left on the floor to threaten safety. Of course, as she returned with the waiter, laden with coffee, cup, glass, etc., held close to her body, she did not, nor could she be expected to, focus her eyes upon the floor below her. She, naturally, looked up and ahead.

■ It is shown that Lewis had theretofore deposited carriers at the end of the counter while making out delivery tickets, but at no time prior to this occasion did he or his helper fail to take the carrier with them when leaving the shop. The suggestion that it was customary to leave carriers on the floor, after completing delivery of milk, is not tenable. The continuous line of conduct of defendant's delivery men should have, and no doubt did, impress the waitresses with the belief that when they left the shop, after making a delivery, conditions about the ice box and the end of the counter were as safe for them as was the case prior to the delivery.

During the first ten days after the accident, plaintiff was treated by Dr. McIntyre of Shreveport. He found no bruises or abrasions on her body. On pressure, she complained of pain over the right sacroiliac region and in the front part of the abdomen. She did not improve under his treatment and he recommended that an X-ray picture be made of the affected area. This, he says, did not disclose any trauma to the joint. However, the picture being negative does not necessarily mean there was no injury in or about the joint. It is shown that the ligaments, muscles, etc., in this joint may be seriously injured from trauma and such not be revealed by the X-ray. Dr. McIntyre, with the picture largely as a basis, reached the conclusion that plaintiff

was exaggerating the seriousness of her ailment. While he was treating her, she also consulted Drs. Alverson and Potts of Shreveport. These physicians examined her together. To them she complained of serious pain in and about the said joint on pressure. Both doctors reached the conclusion that the joint was injured in the fall. Dr. Potts advised her to continue the treatment prescribed by Dr. McIntyre and also to wear a sacroiliac belt as a support to the involved area.

Plaintiff says that she quit work at the hotel because she was physically unable to perform her duties satisfactorily. The manager of the hotel says she assigned as the reason for quitting that she desired to visit her children in Alexandria, La. She went from Shreveport to Alexandria in an automobile and, after tarrying there for a brief time, proceeded by train to Anniston, Ala., where she joined Woodall, who had preceded her. He and she testified that while in Anniston, a physician examined and prescribed for her ailment. They then moved to Andalusia, Ala., and while there consulted a physician who prescribed for her. They next moved to Linden, Ala., where they remained until June 20th. A doctor was there consulted. From Linden they moved to Atlanta, Ga. The baby was born there. It was a normal child in every respect and weighed over seven pounds. During all this time, Mrs. Woodall testified, and she is corroborated by her husband, that she suffered intense pain in the lower part of her back and particularly about the right sacroiliac joint; that the pain extended down the right leg and into the foot. She was able to get about, enter and make exit from trains and automobiles, only with the assistance of Woodall.

We are convinced from a careful study of all the testimony in the case that Mrs. Woodall was badly shaken up from the heavy fall to the tile floor and that the right sacroiliac joint was severely injured thereby, with lesser injury to other parts of that region. The character of pain she experienced thereafter is to be expected from injuries of this kind. It is too well known to admit of debate that the duration of such an injury may not be determined even by those best versed in such matters. It is also true that it is virtually impossible to disprove a profession of pain in this joint where the symptoms are purely subjective. But, in the present case, we have both subjective and objective symptoms.

Mrs. Woodall was confined to the hospital eight days following birth of the baby. During this period she developed fever and pains in the back and sacroiliac joint grew more intense. She was removed to her home, but her condition not improving, seemingly growing worse, she was again placed in the hospital. Among the things done to relieve her suffering was the placing of a plaster cast or jacket on her body, from chest to knees. The purpose of this was to immobilize, as far as possible, the affected joint. She wore this cast for eighteen days. She was again removed to her home and there remained in bed for six weeks. At the end of this period it was found necessary that she use crutches in order to go about. At date of trial (May 13, 1937) she was still using crutches.

It is defendant's contention that Mrs. Woodall's present disability is directly attributable to conditions brought about by her state of pregnancy and the giving birth to the child.

X-ray pictures of the involved joint, made in September, 1936, and in March, 1937, definitely reveal a destructive process of lesion therein. The latter picture discloses that the lesion, due to nature's work, has grown less. Apparently the joint is improving. It is not too far-fetched to believe that ultimately, perhaps within a few months from date of trial, by the observance of due care by the patient, it will attain its normal functioning. The doctors pretty well agree on this phase of her case. They differ as to the time normal, or near-normal, functioning will be attained.

We have the benefit of the testimony of Dr. Guy A. Caldwell, of Shreveport, and of Dr. Randolph Smith, of Atlanta, Ga., eminent orthopedic surgeons. Both made close physical examinations of Mrs. Woodall and studied the X-rays. They do not entirely agree in their opinions as regards the cause of the lesion to the joint. Dr. Caldwell, touching this subject, says: "From the history of undue and prolonged fever following delivery, together with acute pain in the sacroiliac joint which required fixation in plaster for two or three weeks, it seems most probable to me that she had a mild puerperal sepsis with secondary acute infectious arthritis of the sacroiliac joint. The joint has been partially destroyed, but is now being fused by natural repair processes and from the last pictures, the fusion appears to be about complete."

Dr. Smith eliminates septicæmia as a cause of the joint's condition, and in answer to a hypothetical question from counsel, said: "As nearly as I can answer that, I believe that the trauma, the original trauma in a hypothetical case you mentioned, would be the inception of the trouble, and that the subsequent trauma of delivery was the added trauma that made the thing flare up."

After diligent examination and a multitude of tests, he was unable to locate any disease or abnormal condition of the body which could reasonably be ascribed as the cause of the joint's disabled status. He first examined her on August 31st, and observed her intermittently until December 18th. She was confined to bed most of the time. In the course of his testimony, Dr. Smith said: "I found that by using a heavy stick or crutches so as to take the weight off the right leg, she was able to get up some, but she tired rapidly and as she tired, the pain in the right sacroiliac always became worse. I saw her from then on for a number of times, until the 18th of December, which was the last time I saw Mrs. Woodall, professionally or otherwise."

In his report, Dr. Caldwell says: "There is no visible swelling in the region of the sacroiliac joint, but apparent tenderness on pressure over the lower portion of the joint, over the right lumbo-sacral angle and over the mid-dorsal vertebrae in the midline posteriorly and some tenderness along the muscles on the right side of the neck. Forward and side bending movements are freely performed in the standing position, but there is complaint of slight pain at the extremes of motion, pain being referred to the right sacroiliac region."

He first examined Mrs. Woodall on May 11, 1937, two days before trial and eighteen months after the accident. He concedes that Dr. Smith was in a better position to make a correct diagnosis than he.

It is well to note here that the character of pain about the joint, described by Dr. Caldwell, was also present immediately after the accident, as was discovered by Drs. McIntyre, Alverson, and Potts. This is the same sort of pain that Mrs. Woodall says was continuous from the time of the accident until the day of trial, and the same sort found by Dr. Smith.

It seems to us that Dr. Smith's opinion is supported by more cogent reasoning than is that of Dr. Caldwell. To hold otherwise, we must necessarily brand the Woodalls as perjurers. We are not willing to do this, in view of all the facts and circumstances of the case. We feel quite sure that the constant burden incident to full-term pregnancy, coupled with the normal strains, etc., of childbirth, aggravated conditions directly traceable to the original trauma.

Plaintiffs, answering the appeal, pray for an increase in the amount of the judgments. Defendant urges us to reduce both materially. Cases of this character, as has often been said, must be solved from their own facts. No two are identical. It is our opinion that the trial judge, in fixing the awards complained of by both sides, has done substantial justice between the parties. We perceive of no good reason for disturbing his findings as to the facts and the awards.

Judgments affirmed.